GODIE WHEELER v. THE STATE.

No. 606.   Decided March 15, 1911.

1.—Murder—Continuance—Testimony Taken as True.

Where, upon trial of murder, the court overruled the motion for continuance but it was afterwards agreed to admit the testimony of the absent witness and consider the same as true, there was no error in overruling the motion for new trial.

**2.—Same—Sufficiency of the Evidence—Alibi.**

Where, upon trial of murder, defendant claimed an alibi, but the testimony of his witnesses on this issue did not sustain the same, even if the testimony of the absent witness was conceded to be true, there was no reversible error.

**3.—Same—Evidence—Wad—Caliber of Pistol Load.**

Where, upon trial of murder, the State introduced testimony to the effect that, after the State's witness had testified that he was down where the body of the deceased was found the next morning after the homicide, he and another State's witness found two bullets under where deceased's head was lying and that one of them picked up a wad near there and that the same was numbered but that the slip containing the number had been lost, etc., there was no error, inasmuch as the testimony showed that this was the wad produced before the court at a former trial by the same witness, and the whole wad was in court except the paper covering on which was printed the size of the load.

**4.—Same—Evidence—Shells—Cartridges.**

Where, upon trial of murder, the State introduced testimony that a State's witness had made investigation to find shells similar to the one that was found at the place of the homicide but could not find one anywhere in town, and the bill of exceptions on appeal did not show why this testimony was inadmissible, there was no error; especially where other evidence showed that the wad and shells found in defendant's room were of a peculiar kind, and corresponded with those found at the body of deceased.

**5.—Same—Evidence—Motive—Ill Feeling.**

Upon trial of murder there was no error to admit testimony of the State to show ill feeling between the defendant and the deceased, by the declaration made by the defendant some time before the homicide, to the effect that the deceased must stop writing letters or he would be found lying dead on the road.

**6.—Same—Evidence—Threats.**

Upon trial of murder there was no error in admitting testimony showing declarations of the defendant in which he accused the deceased of being the author of defendant's trouble and the cause of the breaking up of the relations between him and a certain young lady, and in which he threatened the deceased.

**7.—Same—Motion to Strike out Evidence.**

Where, upon trial of murder, the testimony was largely circumstantial, there was no error in overruling a motion to exclude the testimony of certain witnesses which covered rather a wide range of circumstances in regard to the facts used to connect appellant with the homicide.

**8.—Same—Charge of Court—Circumstantial Evidence—Reasonable Doubt.**

Where the court in his charge on circumstantial evidence included the reasonable doubt, there was no error in not repeating the same in the conclusion of his charge that the circumstances must exclude to a reasonable and moral certainty every other reasonable hypothesis than that of the guilt of the defendant.

**9.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence supported a conviction of murder in the second degree, there was no error.

Appeal from the District Court of Grimes. Tried below before the Hon. S. W. Dean.

Appeal from a conviction of murder in the second degree; penalty, twenty years imprisonment in the penitentiary.

The opinion states the case.

*Geo. D. Neal, Carl T. Harper* and *W. W. Meachum,* for appellant.—
On question of refusing application for continuance and overruling
motion for new trial: Pearson v. State, 56 Texas Crim. Rep., 607;
Morgan v. State, 54 Texas Crim. Rep., 543; Marsden v. State, id., 70;
Johnson v. State, id., 113; Jones v. State, id., 507.

On question of the court's charge on circumstantial evidence: Jones
v. State, 34 Texas Crim. Rep., 491.

On question of insufficiency of the evidence: Wheeler v. State, 56
Texas Crim. Rep., 547.

*John A. Mobley,* then Assistant Attorney-General, filed a brief when
the case was first submitted.

*C. E. Lane,* Assistant Attorney-General, for the State.—On question
of overruling continuance and motion for new trial upon testimony
admitted to be true: Skaro v. State, 43 Texas, 88; Phipps v. State,
36 Texas Crim. Rep., 216; McGrew v. State, 31 Texas Crim. Rep.,
336.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of mur-
der in the second degree, his punishment being assessed at twenty years
confinement in the penitentiary.

The former appeal will be found reported in 56 Texas Crim. Rep.,
547.

1. Error is assigned on the refusal of the court to grant a continu-
ance for two absent witnesses. The court qualifies the bill of excep-
tion by stating, substantially, that the application on its face showed
merit, but overruled it, believing that the evidence of the witnesses
might be secured during the trial, and if not, and a conviction re-
sulted, a new trial could be awarded. Attachment was served, and
one of the witnesses brought into court and testified. The other wit-
ness was not produced on account of sickness, but it was agreed by
the State that her testimony could be used with the admission that
it was to be taken as true, and her testimony was used and conceded
to be true. Viewed from the standpoint of the motion for new trial,
there was no error. Phipps v. State, 36 Texas Crim. Rep., 216; Mc-
Grew v. State, 31 Texas Crim. Rep., 336; Skaro v. State, 43 Texas, 88.

2. Taking the testimony of the absent witness as being true, ap-
pellant makes one of the serious contentions suggested for revision.
That contention is that her testimony being conceded to be true must
be so taken, and that being so taken the evidence is not sufficient to
justify the conviction. Appellant's contention, under the testimony of
this witness, who was Bessie Plasters, was that the killing occurred at
or before one o'clock at night, and the defendant was in his room at

Vol. LXI Crim.—34.

one o'clock at night. If her testimony puts him in his room at one o'clock at night, as contended, then he was about two thousand yards or such matter from the place of the homicide at that time. There was a protracted meeting going on in the neighborhood, which all the parties attended. Mrs. Plasters, who was then Miss Wheeler, and another sister of appellant who testified in this case under the name of Mrs. McAdams, reached their home in company with appellant and Carl McAdams at 12:15 o'clock, making it just after midnight. That she and her sister went to their room, both then being young ladies; that a little later her brother came in after unharnessing the horses; sleeping apartments were furnished appellant and Carl McAdams, they sleeping in separate but adjoining rooms. They all went to bed directly, and after appellant and McAdams had retired the ladies went to the dining-room for the purpose of obtaining something to eat. Directly they went to bed. She says: "We went in our room where we were to sleep and went to bed. We heard the clock strike one after we got in bed. That was not long before I went to sleep; I then went to sleep. Up to that time Godie had not been out of the house. I had been up, and he could not have gone out without me knowing it." She also testifies that appellant was there early the next morning, when she saw him about sunrise. The testimony also shows that the clock referred to by Mrs. Plasters struck the half hour as well as the hour. Unless her language as quoted, to wit, "We heard the clock strike one after we got in bed," definitely fixed the time at one o'clock, it may have been as well half after twelve, as the clock struck the half hour. So that we take it that her statement is not definite that it was one o'clock, but it is definite that she heard the clock strike one. She does not attempt to fix the exact time or anything like the exact time in minutes elapsing between the time they arrived at home and the time that she laid down. She may have gone to bed within the fifteen minutes elapsing between 12:15 and 12:30. Inasmuch as she does not fix it definitely, it would be a matter of speculation as to whether the clock struck the hour or the half hour. This testimony bears upon the question of alibi sought to be established by appellant.

Another witness testified, in this connection, that he heard the shots fired that are supposed to have killed deceased, and that a few minutes afterwards—some ten or fifteen—his clock struck one, but he did not know whether his clock kept the correct time or not. It is a conceded fact which forms the basis of this prosecution that somebody killed the deceased, Sam Thomas. Leaving the place where the meeting was in progress, after it had closed for the night, those who went to the Wheeler residence reached that point at 12:15 o'clock by the clock at the Wheeler residence. It seems from the testimony that those who went to the Wheeler residence had parted company or left Sam Thomas, the deceased, who was in a buggy with a Miss Sandle, about a thousand yards from their residence at the gate of Mr. Wheeler. In going from the gate to the Wheeler residence the witnesses indicate

that they went in the usual gait, sometime in a trot and sometime in a walk. It would have taken something like ten minutes to cover that distance. Then they parted company with deceased, under this view of it, about five minutes after twelve o'clock by the Wheeler clock. Sam Thomas, the deceased, as before stated, was in a buggy with a Miss Sandle, taking that young lady home from church. From where they parted company it seems to have been about three and three-quarters to four miles to the Sandle residence, to which place deceased conducted Miss Sandle. In going to her residence Miss Sandle makes it appear that they traveled sometime in a walk and sometime in a trot. In other words, from her testimony there seems to have been no extra speed in going that distance. The witness Robert Harmon was traveling the same road and overtook deceased and Miss Sandle near a little creek near Mr. Choate's residence, between the Wheeler residence and San Jacinto river. He did not pass deceased and Miss Sandle, however, but there was something said about the parties stopping at the creek to get a drink of water; that deceased and Miss Sandle went on ahead. If we assume that at the rate of speed deceased and Miss Sandle were traveling it would take them something like three-quarters or an hour to reach the Sandle residence, then it was shown that from Sandle's back to the point where the homicide occurred was something like five or five and a quarter miles. Deceased would have to make this distance—three and three-quarters to four miles to Sandle's, and then return five or five and a quarter miles to the point of the homicide. Under this view of the testimony, and the manner of traveling shown by the witnesses, the homicide could have hardly occurred earlier than 1:30 by the Wheeler clock. If so, then Mrs. Plasters' testimony does not establish the alibi beyond controversy. Under any view of her testimony, it would not be beyond one o'clock at the time, or a few minutes after one when she went to sleep. She did not speak of hearing the clock strike one but one time. If that was 12:30, then the alibi is of no moment, but if the hour struck was in fact one o'clock, then the deceased would have had to ride something like eight or nine miles to be back at the point of the homicide at the time the other witness places him some ten or fifteen minutes before one o'clock. This, under the facts detailed, would have been an impossibility. So the time of the homicide is not accurately fixed by any of the testimony, but we may assume as a safe criterion by which to judge it, that at the rate of speed deceased was shown to have traveled, that it must have been fully an hour and a half or longer before he reached the place where the killing occurred.

Another witness, Adam West, testifies that some time that night, which he did not undertake definitely to fix, he was going from a certain house across to another one, and en route he saw the defendant returning from the direction of where the homicide is shown to have occurred with a shotgun in his hand. That when he saw defendant coming he secreted himself until the defendant passed along. This he

swears was a few minutes after the shooting. Some other facts may be stated in this connection. One is that deceased was killed by two loads discharged from a shotgun and two from a 45-calibre pistol. The two loads of the shotgun were fired from a clump of bushes; the two pistol balls were fired into the body of deceased after he had fallen. Whoever killed the deceased did it after a very careful planning, and evidently had knowledge of the movements of the deceased that night, and the further fact that he would return to a certain gate to go to his father's residence. When deceased reached the gate he got out of the buggy to open the gate, and when he did this he was fired upon and killed. The party was secreted in a clump of bushes. It was after deceased had fallen that the two pistol balls were fired into his body. These were found in the ground under the place where the body was lying. There are some other facts with reference to the character of the cartridges and shot that were introduced in evidence; that appellant had the same character of cartridges in his house, and no others were found after careful investigation in the neighborhood. The next morning when the neighborhood gathered at the scene of the tragedy appellant was present. A question came up in regard to who owned a pistol that carried the balls that were found shot into the body of deceased. Appellant, as well as the remainder of the crowd, present, denied having any such pistol. The houses in the neighborhood were investigated and searched. In appellant's room was found a shotgun recently discharged—as the witness says, not at a more remote period than twelve or sixteen hours, and in his trunk was found a 45-calibre pistol with two empty chambers recently discharged. The owner of the pistol testified that he had exchanged it with appellant the evening before the homicide which occurred that night. That appellant borrowed the pistol from him and left with him his, appellant's, rifle. These facts are sufficient to overcome any reasonable hypothesis of innocence. In fact, they would seem all sufficiently cogent to prove appellant's guilt. We are of opinion, in view of all this evidence, as well as Mrs. Plasters' evidence, conceding absolute verity to her statement that she did not fix and determine under her admitted testimony that appellant was at home at the time of the homicide. In fact, we think the testimony cogently shows that while he may have been at home at the time indicated by her, if it was even one o'clock, yet all these facts show that he had ample time to go to the point of the homicide, and was the party who did, in fact, fire the gun that killed deceased.

3. Objection was urged to the evidence introduced by the State to the effect that after Arch Thomas had testified that he was down where the body was the morning it was found; that they found two bullets under where deceased's head was lying; that Bob Williamson picked up a wad somewhere right near there, the following facts were introduced: That wad was numbered, but witness did not know what the number was—did not remember whether it had the gauge of the load

on it or not. Williamson gave that wad to witness that he picked up; that he put it in his pocket, and he supposed that the wad was there in the town of Anderson—or it ought to be; that he had it on the last trial; that he left the wad lying on the table at the time of said last trial; that when that wad was exhibited at the last trial it was not in the same condition as it was when Bob Williamson gave it to witness. The difference was that the little slip of paper on the wad that had the number of the wad on it was off; that the slip of paper had the number of the load on it; that witness remembered that Bob Williamson asked him about that wad that was found there that evening; that he examined the wad; that he did not remember whether the sheriff of Walker County, Mr. Farris, examined it or not. That witness had lost the piece of paper that had the number on it; that he lost it before the former trial of this case. The bill sets out various objections. The court signs the bill with this qualification: "The testimony of this witness, taken together with the testimony of Frank West, the clerk, of Gordon Boone, the district attorney, clearly established that this was the wad produced before the court at a former trial by this witness, and the whole of the wad was in court except the thin white paper covering on which was printed the size of the load." As explained, we think this testimony was admissible, and there is no merit in the objections urged.

4. Another bill recites that the State was permitted, over appellant's objection, to prove by the witness Williamson that he had made an investigation to see if he could find shells similar to the one that was found at the place of the homicide, and in making this investigation he went to several hardware stores, which are mentioned in the bill, and failed to find any similar shells. Appellant objected to this testimony for various reasons, as set out in the bill, but the court signs it with this qualification: "The witness testified as stated in the bill, and the only objections urged or stated to the court were that the witness' investigation was not legal and was prejudicial to the rights of defendant." We deem it unnecessary to review this matter at length in the attitude in which the qualification places the bill. The objections stated to the court at the time are of a very general nature, and are but, to say the least of it, general demurrers to the testimony. How this witness' investigation was not legal and was prejudicial to appellant's rights is not stated. Any damaging testimony in a sense might be prejudicial, in that it would bring conviction to the minds of the jury of guilt. It is a well-settled rule that where the exceptions to the introduction of testimony are of a very general nature, they will not be entertained if the testimony was or could be admissible for any purpose. This testimony might have been admissible for several purposes, we think, under this record. Perhaps we might state one that lies on the surface: The wad and the shells were of a peculiar make and peculiarly loaded. One of the witnesses stated at the time that he would give five dollars for shells of the same kind. In

appellant's room was found a box of the shells corresponding with that found at the place of the homicide. It was, of course, a pregnant fact of some damaging effect to show that appellant was the only man in the neighborhood or in that section of the country who owned or had such shells. Under a general objection we are of opinion, therefore, this testimony was admissible. If it was not, the reason why it was not should have been stated. The exception should not have been so general, but should have been more special in nature.

5. Another bill recites, in substance, that the State, in order to show a motive on the part of appellant to do the killing, and that he made threats against the deceased, proved by Miss Ellen Sheppard that she had never had any conversation with Godie Wheeler with reference to some letters before the killing of Sam Thomas, and before his body was found. She did not recall that she had heard appellant speak anything with reference to any letters in connection with deceased any time before the death of deceased, "only over there one day, Godie said if that letter-writing didn't end, Sam Thomas, or whoever was doing it, would be found lying in the road somewhere." It was during the letter-writing that he made that statement. Witness did not recall just how long this letter-writing was, but it was something like a year before the homicide. She reiterated that defendant said, "If that letter-writing didn't cease, Sam Thomas, or whoever was doing the talking, would be found dead lying in the road somewhere." On cross-examination she testified that Sam Thomas had paid special attention to her as a lover. That appellant had never done so. That she knew her father and appellant were talking about the letter-writing. She said by letter-writing she means she had received some letters, and appellant said, "If the letter-writing did not cease that Sam Thomas, or whoever was doing the talking, would be found lying in the road somewhere." Re-crossed by appellant, she said: "The letters that I had been getting never had Godie Wheeler's name signed to them; he denied writing the letters." Q. Didn't he make that remark in connection with somebody using slanderous matters about women? He said that he was not guilty of it. Wasn't the letters slanderous about ladies, and wasn't he charged with it, and didn't he say that he did not write them, and if it did not stop he would do like he said? A. Yes, sir. Re-direct by the State: "Sam Thomas' name was signed to the letters. I don't know whose handwriting they were in. They were not in Sam's handwriting. I don't know where the letters came from. The reason that Godie mentioned the letters is because some of them had accused him of writing the letters, or some of his sisters; it was in that connection that he made the statement."

Several objections were urged to this testimony. The bill is thus qualified by the court: "That the testimony was introduced to show bad feeling between defendant and the deceased, and the contents of the letters were not proved before the jury, and the letters themselves

would have been immaterial—only subject of inquiry being the feeling of the defendant toward the deceased." With this qualification, and, as we think, manifested by the bill itself, this testimony was admissible.

The record shows beyond any question bad feeling on the part of appellant towards deceased, and threats were made by him. The evidence above quoted was admissible to show appellant's state of mind towards the deceased. Whether he was justified in having this condition of mind is not the question here. The fact that his mind was in that condition towards deceased is the point at issue, and this testimony was legitimate as tending to prove that fact.

6. Another bill recites that the State was permitted to prove by its witness Smith that he had a conversation with appellant on Tuesday afternoon before deceased was killed; that he and his family were at Mr. Wheeler's for dinner; that they went there from church; that a meeting was in vogue at the time, and after dinner this witness and appellant went out to attend to their horses and feed them, and in a conversation about the meeting the witness said it seems like they were going to have a good meeting, and appellant said, "Yes, you don't know these damn people like I do," and he further said, "Whenever it seems that a person wants to do better, they went to telling lies on him," and witness asked him what was the matter now; and witness said he would not pay any attention to it, and appellant said, "Well, I am, though;" and he further said, "They started a lie on me," and witness asked him what it was, and he said they had "started a tale on him that he had been  .  .  . " (and he pointed back), and further said that "he had been there to a negro to-do and messing around with the negroes," and witness said, "Who did it?" and he said, "I don't know exactly yet, but I will find out, and am going to find out," and he said, "Though I think it was Arthur Thomas and his wife, Mag." He also stated he was going to trace it up, or have it traced up, and if he did not mind, somebody would "get hurt." He said he "thought it was done to break him up with that girl, Alice Powledge." The bill recites the State introduced this testimony to show malice and intent and threat to kill Sam Thomas by appellant. Whereupon the court said: "I will overrule the objections for the present, and if I later see fit to sustain them I will do so." This testimony, the bill further recites, was not excluded or withdrawn from the jury. The bill does not recite any objection, except that it was immaterial, irrelevant and prejudicial. The court thus qualifies the bill: "That the testimony clearly established, taken in connection with the testimony of the other witnesses in the case, that the defendant had accused the deceased of being the author of his trouble and the cause of the breaking up with the young lady mentioned, and it was allowed to be introduced for the purpose of showing the state of feeling of the defendant toward the deceased. But the only objection urged to this testimony was that it was immaterial, irrelevant and prejudicial, without any

statement showing how it was so." This bill was accepted with this qualification. We are of opinion that viewing it from this condition of the record there was no error. This qualification of the bill recites that defendant accused deceased of being the author of his trouble and the cause of the breaking up with the young lady mentioned, who was Miss Alice Powledge. The court does not go into a statement of which of the witnesses connected up this matter, but leaves it in that condition by a general statement that it was so connected. Bob Powledge testified for the State, and, among other things, he said: "I had a conversation with Godie Wednesday at the church concerning him coming to see my daughter; he called me off and asked me what about the tales that had been told to my wife about him associating with some negroes, and I forbid him coming to my house, and that he couldn't associate with my daughter. I met him at the church there on Wednesday night, and he taken Arthur Thomas—Sam Thomas' name was mentioned in that conversation. Godie said that he denied it, and he knew God damn well he said it, and I said, 'Rather than have any trouble about it, drop it at what he said,' and he said, 'It is a God damn lie, and it was done to make them fall out with me, and Sam was at the bottom of all of it.' He said it was done to make our family fall out with him, and that Sam Thomas was at the bottom of the whole God damn thing, and that he had been meddling with his business previous to that, and if he didn't stop it, 'God damn him,' he was going to kill him, and that he couldn't run over him any longer. That was on Wednesday night at the church house."

We are of opinion, taking the testimony of Mr. Powledge alone, that the court was justified in the statement that he uses in the qualification, and that the matter was sufficiently connected to show that appellant believed that Sam Thomas, the deceased, was the cause of his trouble with Miss Powledge in connection with the negro matter.

7. After the testimony was all in there was a motion made to exclude the testimony of certain witnesses which covered rather a wide range of circumstances in regard to the facts used to connect appellant with the homicide, some of which have been already mentioned in previous bills of exception. We are of opinion that the testimony of the witnesses was properly admitted, and the court did not err in not excluding same. The bills are lengthy, setting out considerable amount of the testimony of the named witnesses. The testimony of these witnesses covered to some extent some of the salient features of the evidence.

8. The charge on circumstantial evidence is criticised. We are of opinion the charge is correct. The charge as given is in the following language:

"In this case the State relies for a conviction upon circumstantial evidence alone, and in order to warrant a conviction of an offense upon circumstantial evidence each fact necessary to establish the guilt of defendant must be proved to the satisfaction of the jury, by the evi-

dence, beyond a reasonable doubt, all the facts—that is, the necessary facts—to the conclusion sought to be obtained, must be consistent with each other and with the defendant's guilt, and the circumstances taken together must be of a conclusive nature, leading on the whole to a satisfactory conclusion and producing in effect a reasonable and moral certainty that the defendant and no other person committed the offense charged, and must exclude to a reasonable and moral certainty every other reasonable hypothesis than that of the guilt of defendant."

The ground of objection to this charge is that the court omitted between the words "and must exclude" and "to a reasonable and moral certainty every other reasonable hypothesis than that of the guilt of defendant," the words, "beyond a reasonable doubt." In other words, that portion of the charge should have been so written as to make it read as follows: "And must exclude beyond a reasonable doubt to a reasonable and moral certainty every other reasonable hypothesis than that of the guilt of defendant." The reasonable doubt is sufficiently inserted in the quoted charge, and it was not material error, we think, to omit it at the particular point designated. The cited case of Jones v. State, 34 Texas Crim. Rep., 491, is not in point. The point of objection in the Jones case was that the court omitted to charge the jury that such evidence must be of so conclusive a nature as to exclude every reasonable hypothesis except the guilt of the accused. The omission in the charge in the Jones case does not occur in the charge of the court here. It was expressly included in the charge given by the court. The Jones case, therefore, is not in point. We are of opinion that there is no merit in appellant's contention in regard to this charge, that it is in sufficient compliance with the law and the authorities, and that it sufficiently conveyed to the minds of the jury a clear conception of the law of circumstantial evidence.

9. Nor are we of the opinion that there is any merit in the contention of appellant that the evidence fails to justify this conviction. We think we have sufficiently stated the case to show that the evidence fully justified the verdict of the jury, without going further into detail. We are of opinion that the evidence does show, under the strictest rule of law in regard to circumstantial evidence, that the State has made out a case against the defendant. The proof of motive, threats, the recently discharged shotgun, recently fired pistol, both of which correspond exactly with the weapons that made the wounds on the body of deceased, the fact that appellant was found in possession of the pistol and shotgun, that in his room was found the peculiar character of shells used in the homicide as fired from the shotgun, the fact that witness West saw appellant just after the shooting and within a short distance of where the shots were fired coming away from the scene of the shooting, going in the direction of his home, the tracks, the knowledge on the part of appellant of deceased's movements that night, and intended movements as to his destination, and the manner

of reaching that destination at night, and all these circumstances, places appellant's guilt beyond any question in our judgment. The judgment is affirmed.

*Affirmed.*